No. 24-5649

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

HOLLY LAWSON,

*Plaintiff – Appellant*

v.

KAYLA CREELY, Individually; LORI FRANKE, Individually;
MARK KOPP, in his individual and official capacity; FRANKLIN
COUNTY, KY BOARD OF EDUCATION,

*Defendant – Appellee*

---

Appeal from the United States District Court
Eastern District of Kentucky, Central Division at Frankfort
Case No. 3:22-cv-00023-GFVT

---

## BRIEF FOR APPELLEES,
## MARK KOPP and THE BOARD OF EDUCATION
## OF FRANKLIN COUNTY, KENTUCKY

---

 /s/ *Grant R. Chenoweth*
Grant R. Chenoweth
Jonathan C. Shaw
PORTER, BANKS, BALDWIN & SHAW, PLLC
327 Main Street ~ P.O. Drawer 1767
Paintsville, Kentucky 41240
(606) 789-3747
*gchenoweth@psbb-law.com*
COUNSEL FOR APPELLEE

No. 24-5649

## UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

---

HOLLY LAWSON,

*Plaintiff – Appellant*

v.

KAYLA CREELY, Individually; LORI FRANKE, Individually;
MARK KOPP, in his individual and official capacity; FRANKLIN
COUNTY, KY BOARD OF EDUCATION,

*Defendant – Appellee*

---

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

---

Pursuant to 6 Cir. R. 26.1, the Appellees Mark Kopp and the Board of Education of
Franklin County, Kentucky, make the following disclosures:

1.     Are said parties a subsidiary or affiliate of a publicly owned corporation?

**No. Mark Kopp is an individual, and the Board of Education is a body politic
and corporate and is an agency of the Commonwealth of Kentucky.**

2.     Is there a publicly-owned corporation, not a party to the appeal, that has a
financial interest in the outcome?

**No. Mark Kopp and the Board of Education are insured and potentially
indemnified in this matter through a policy of insurance with Liberty Mutual,
which is not publicly traded.**

| | |
|---|---|
| /s/ *Grant R. Chenoweth* | October 3, 2024 |
| (Signature of Counsel) | (Date) |

i

# **TABLE OF CONTENTS**

STATEMENT OF CORPORATE AFFILIATIONS
AND FINANCIAL INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii-vii

STATEMENT CONCERNING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . viii

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-13

I.    Record Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-12

II.    Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-47

I.    Lawson Did Not Plead or Prove a Violation
      of her Fifth Amendment Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . 16-19

II.    This Court Cannot Grant Lawson's
       Request for Equitable Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

III.   Lawson Cannot Demonstrate State Action
       by Creely and Franke, for purposes of
       Establishing *Monell* Liability Against
       the Board; Nor Can She Demonstrate *Monell*
       Liability Even if State Action is Found to Exist. . . . . . . . . . . . . . . 21-29

IV.    Lawson's Constitutional Rights were Not
       Violated by Defendant Kopp. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29-43

V.     Superintendent Kopp is Entitled to
       Qualified Official Immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43-47

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

DESIGNATION OF RELEVANT
DISTRICT COURT DOCUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Akers v. McGinnis*, 352 F.3d 1030 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 46

*Anderson v. Creighton*, 483 U.S. 635 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Arban v. West Publ'g Corp.*, 345 F.3d 390 (6th Cir. 2003) . . . . . . . . . . . . . . . . . 20

*Berry v. Delaware County Sheriff's Office*,
796 Fed. Appx. 857 (6th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27,28

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*,
520 U.S. 397 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Brown v. Shaner*, 172 F.3d 927 (6th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . 27

*California v. Beheler*, 463 U.S. 1121 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . 31,41

*Chavez v. Martinez*, 538 U.S. 760 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*City Mgmt. Corp. v. U.S. Chem. Co.*, 43 F.3d 244 (6th Cir. 1994) . . . . . . . . . . . 16

*City of Canton v. Harris*, 489 U.S. 378 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Clemente v. Vaslo*, 679 F.3d 482 (6th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . 46

*Daugherty v. Campbell*, 935 F.2d 780 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . 44

*Doe v. Claiborne County*, 103 F.3d 495 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . 23

*Dunaway v. New York*, 442 U.S. 200 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*El v. City of Pittsburgh*, 975 F.3d 327 (3d Cir. 2020) . . . . . . . . . . . . . . . . . . . . . 47

*Florida v. Bostick*, 501 U.S. 429 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30,39

*Florida v. Royer*, 460 U.S. 491 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Gammons v. Adroit Med. Sys.*, 91 F.4th 820 (6th Cir. 2024). . . . . . . . . . . . . . . . 16

*Gardner v. Broderick*, 392 U.S. 273 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Garrity v. New Jersey*, 385 U.S. 493 (1967) . . . . . . . . . . . . . . . . . . . . . . . 19,39,47

*Gunter v. Bemis Co.*, 906 F.3d 484 (6th Cir. 2018). . . . . . . . . . . . . . . . . . . . . 20,21

*Hackett v. City of S. Bend*, 956 F.3d 504 (7th Cir. 2020) . . . . . . . . . . . . . . . . . . 17

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Harris v. City of Saginaw*, 62 F.4th 1028 (6th Cir. 2023) . . . . . . . . . . . . . . . . . . 28

*Howes v. Fields*, 565 U.S. 499 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Levine v. DeJoy*, 64 F.4th 789 (6th Cir. 2023). . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Macglashan v. ABS LINCS KY, Inc.*, 448 S.W.3d 792 (Ky. 2014) . . . . . . . . . . . 20

*McKinley v. City of Mansfield*, 404 F.3d 418 (6th Cir. 2005) . . . . . . . . . . . . . . . 19

*Michigan v. Tucker*, 417 U.S. 433 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Miranda v. Arizona*, 384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . . . 18,19,41,47

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978) . . . . . . . . . . . . 14,21,24,27

*Monistere v. City of Memphis*, 115 Fed. Appx. 845 (6th Cir. 2004) . . . . . . . . . . 27

*Mosier v. Evans*, 90 F.4th 541 (6th Cir. 2024). . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*O'Conner v. Ortega*, 480 U.S. 709 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

v

*Renda v. King*, 347 F.3d 550 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Rich v. City of Mayfield Heights*, 955 F.2d 1092 (6th Cir. 1992) . . . . . . . . . . . . . 45

*Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392 (6th Cir. 1993) . . . . . . . . . . . . . . . 20

*Saucier v. Katz*, 533 U.S. 194 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Shadrick v. Hopkins County*, 805 F.3d 724 (6th Cir. 2015) . . . . . . . . . . . . . . . . 28

*Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555 (6th Cir. 2004). . . . . . . . . 16

*Stansbury v. California*, 511 U.S. 318 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Stengel v. Belcher*, 522 F.2d 438 (6th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . 22

*Tarter v. Raybuck*, 742 F.2d 977 (6th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . 38

*Terry v. Ohio*, 392 U.S. 1 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17,18,30

*United States v. Collis*, 766 F.2d 219 (6th Cir. 1985) . . . . . . . . . . . . . . . . . 30,32,39

*United States v. Forness*, 125 F.3d 928 (2nd Cir. 1942) . . . . . . . . . . . . . . . . . 17,18

*United States v. Fortney*, 772 Fed.Appx. 269 (6th Cir. 2019). . . . . . . . . . . . . . . 42

*United States v. Gaddie*, 2008 U.S. Dist. LEXIS 37135
(W.D. Ky. May 6, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Hinojosa*, 606 F.3d 875 (6th Cir. 2010) . . . . . . . . . . . . . . . 37,47

*United States v. Lanier*, 73 F.3d 1380 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . 24

*United States v. Levenderis*, 806 F.3d 390 (6th Cir. 2015) . . . . . . . . . . . . . . . . . 41

*United States v. Lopez-Arias*, 344 F.3d 623 (6th Cir. 2003) . . . . . . . . . . . . . 34,35

vi

*United States v. Luck*, 852 F.3d 615 (6th Cir. 2017) . . . . . . . . . . . . . . . . . . . 37,47

*United States v. Mahan*, 190 F.3d 416 (6th Cir. 1999) . . . . . . . . . . . . . . . . . 31,36

*United States v. Martinez*, 795 Fed. Appx. 367 (6th Cir. 2019) . . . . . . . . 37,41,47

*United States v. Mendenhall*, 446 U.S. 544 (1980) . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Murphy*, 107 F.3d 1199 (6th Cir. 1997) . . . . . . . . . . . . . . . . . 33

*United States v. Panak*, 552 F.3d 462 (6th Cir. 2009) . . . . . . . . . . . . . . . . . 36,47

*United States v. Salvo*, 133 F.3d 943 (6th Cir. 1998) . . . . . . . 30,35,37,38,39,41,47

*United States v. Saylor*, 705 F. App'x 369 (6th Cir. 2017) . . . . . . . . . . . . . . . . 41

*United States v. Zabel*, 35 F.4th 493 (6th Cir. 2022) . . . . . . . . . . . . . . . . . . 38,47

*Wegener v. Covington*, 933 F.2d 390 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . 45

*West v. Atkins*, 472 U.S. 42 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Williams v. Ellington*, 936 F.2d 881 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . 47

*Wilson v. Webb*, 2000 U.S. App. LEXIS 23585 (6th Cir. 2000) . . . . . . . . . . . . . 23

**STATUTES**

42 U.S.C. §1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18,21

KRS 160.160(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

KRS 160.370 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

KRS 160.390 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

KRS 161.020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

KRS 161.028 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

KRS 161.790 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**CONSTITUTIONAL PROVISIONS**

Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,14,16,17,18,19,45,47

**RULES**

Fed. R. App. P. 28(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Fed. R. Civ. P. 52 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fed. R. Civ. P. 52(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fed. R. Civ. P. 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## <u>STATEMENT CONCERNING ORAL ARGUMENT</u>

These Appellees believe oral argument would assist the Court in consideration of the unique constitutional questions and qualified immunity issues raised in this matter, and therefore respectfully request oral argument be scheduled.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

Lawson does not seek this Court's review of the Trial Court's determination that her complaint did not allege a Fifth Amendment violation, such that Fifth Amendment precedent and Fifth Amendment analysis should not be used to analyze her claim.

In addition to considering the issues specifically identified by Plaintiff/Appellant Holly Lawson (Lawson), in the event the Court disagrees with the District Court's analysis of Lawson's constitutional claims against Superintendent Mark Kopp (Kopp) in his individual capacity, this Court is requested to consider affirmation on the alternative ground of qualified immunity which was briefed below but not reached by the District Court due to the threshold determination that Kopp did not violate Lawson's constitutional rights.

The Board of Education does not invite the Court to review its alternative argument concerning Eleventh Amendment immunity, as the Board acknowledges the factual record and briefing below provide an inadequate basis for this Court to give reasoned analysis to this question.

## STATEMENT OF THE CASE

The facts and procedural history, including specific district court rulings relevant to this appeal, are as follows:

## I.    Record Facts

During 2020-21 school year, Lawson was employed as a guidance counselor at the Franklin County High School (FCHS), a part of the Franklin County Schools (FCS) operated by the Defendant Board of Education. Complaint ¶10 (R. 1, Page ID#: 4). Defendant Kayla Creely (Creely) was also employed as a guidance counselor at FCHS. Creely Deposition (R. 38, Page ID#: 691). Defendant Lori Franke was the registrar at FCHS and her desk was in the guidance suite where Lawson's and Creely's offices were located. Franke Deposition (R. 39, Page ID#: 837, 839). Defendant Mark Kopp (Kopp) was the Superintendent of the FCS. Complaint ¶5 (R. 1, Page ID#: 3).  It is undisputed that neither Creely nor Franke served in any role supervising, evaluating, or overseeing Lawson.

On the weekend of the 2021 Kentucky Derby (Saturday, May 1) Lawson traveled from Franklin County to Owensboro for a social gathering. Complaint ¶13 (R. 1, Page ID#: 4). Lawson carried a firearm with her for that event, and placed it in a large purse during her return trip on Sunday, May 2. Lawson Deposition (R. 40, Page ID#: 1093). In her deposition, Lawson admitted to carrying the gun with her into

the school building on Monday, May 3. Lawson Deposition (R. 40, Page ID#: 1093).
The gun went undiscovered on that date, and her admitted criminal conduct on that
date is not the subject of any of the allegations of the Complaint.

On Tuesday, May 4, Lawson still had the gun with her in her purse. Complaint
¶15 (R. 1, Page ID#: 4). On the afternoon of May 4, Lawson claims she left her office,
locking her door but leaving her purse under her desk. Complaint ¶16 (R. 1, Page
ID#: 4). While her Complaint claims the purse was "outside any possible view unless
her office was accessed or searched" (*id.*), the pictures submitted by her counsel
reveal it was possible to view items under her desk both through the glass window of
her closed office door and from standing in her office doorway when it was open.
R. 46, Page ID#: 1449 (item visible under desk through door glass), Page ID#: 1451
(item visible under desk viewed from doorway).  Though Lawson says she locked her
door, Creely testified she did not have to utilize her keys to enter Lawson's office
later. Instead, both Creely and Franke testified Lawson's door was standing open
when they left Creely's office to go to Lawson's doorway. Creely Deposition (R. 38,
Page ID#: 727); Franke Deposition (R. 39, Page ID#: 860). There is no record
evidence as to how Lawson's door became unlocked or opened before Creely and
Franke entered, or whether Lawson's believed attempt to lock it as she exited was

3

instead unsuccessful.[1] Though Lawson did not share her office with anyone else (Complaint, ¶17; R. 1, Page ID#: 4), she acknowledged the same key worked each of the counselors' office doors and they could enter each other's office when needed (Lawson Deposition, R. 40, Page ID#: 984, 1097; Creely Deposition, R. 38, Page ID#: 702). Franke testified the custodians had keys to the doors within the guidance suite. Franke Deposition, R. 39, Page ID#: 847-848. Additionally, Franke testified the custodians came into the guidance suite each afternoon to take out the trash from each counselor's office and perform other custodial tasks. Franke Deposition, R. 39, Page ID#: 849.

Lawson admits to taking some manner of medication in the early afternoon on May 4, and testified it was plain ibuprofen, despite her Complaint asserting the medication she took was a prescription anxiety pill. Complaint ¶18, R. 1, Page ID#: 5; Lawson Deposition, R. 40, Page ID#: 1092-1093. Whichever medication she took, this was observed by Creely on both May 3 and May 4. Creely Deposition, R. 38, Page ID#: 714-715, 720. Lawson asserts Defendants Creely and Franke "had no reason or justification to believe that there was anything untoward or illegal about"

---

[1]    This is not a disputed issue of material fact. Lawson was not present when Creely and Franke accessed her office, so she has no personal knowledge which contradicts their testimony that the door was unlocked when they accessed it. It is pure conjecture and speculation by Lawson that Creely or Franke unlocked the door.

her use of whatever medication she took. Complaint ¶18, R. 1, Page ID#: 5. However, Creely and Franke testified as to Lawson's apparent manic or excited state on May 3 and her sluggish state on May 4, including slurring her words. Creely Deposition, R. 38, Page ID#: 714, 717-718; Franke Deposition, R. 39, Page ID#: 855, 857.

Sometime after lunch on May 4, Creely and Franke both witnessed Lawson leave the guidance suite, but neither of them knew where she had gone, and Lawson did not inform Franke where she was going or how long she expected to be gone, despite Franke being the individual who would need to answer for her whereabouts if anyone called or came to the guidance suite to see Lawson. Franke Deposition, R. 39, Page ID#: 859. Franke asked Creely if she knew where Lawson had gone and Creely was also unaware. Franke Deposition, R. 39, Page ID#: 860. They looked to the parking lot from Creely's office window and could not see Lawson's vehicle. Creely Deposition, R. 38, Page ID#: 726-727. Then they both stepped out of Creely's office and to the doorway of Lawson's office. As noted above, they found the door standing open, though Lawson believed she locked it as she left. From the doorway, they could see more of the parking lot than was visible from Creely's office and still could not see Lawson's vehicle. Creely Deposition, R. 38, Page ID#: 717; Franke Deposition, R. 39, Page ID#: 861. From the doorway where she was looking through Lawson's office out the windows, Creely could also see the bottom of Lawson's purse

5

under Lawson's desk. Creely Deposition, R. 38, Page ID#: 718. Franke also saw Lawson's purse from the doorway when it was pointed out by Creely. Franke Deposition, R. 39, Page ID#: 861. On impulse, Creely went around Lawson's desk to access her purse because she wanted to know what medication Lawson was taking. Creely Deposition, R. 38, Page ID#: 718. Franke followed. Franke Deposition, R. 39, Page ID#: 863.

Lawson claims her purse was "closed" and latched. Complaint ¶19, R. 1, Page ID#: 5; Lawson Deposition, R. 40, Page ID#: 1098-1099. The nature of the purse, as seen in R. 38-13; 38-14; 43-3; 43-4; and 43-5 (Page ID#: 819, 820, 1266, 1267), is that it had a single brass hook in the center of one side and single brass ring in the center of the other side (with no accompanying zippers, buttons, magnets, or other closing mechanism), such that latching the purse would not conceal the contents thereof. Creely and Franke both testified the purse was open when they stepped around Lawson's desk. Creely Deposition, R. 38, Page ID#: 733; Franke Deposition, R. 39, Page ID#: 863. The pill bottles were on top in the bag, and Creely picked up each one and read the label out loud, then returned each bottle to the purse. Creely Deposition, R. 38, Page ID#: 731. As she was returning the last bottle, she observed the gun. Creely Deposition, R. 38, Page ID#: 731-732. Creely informed Franke, who also leaned over to look into the purse and also saw what appeared to be the butt of

a gun. Franke Deposition, R. 39, Page ID#: 865. Neither Creely nor Franke touched

the gun, and they both left Lawson's office. Creely Deposition, R. 38, Page ID#: 732.

Lawson's admitted possession of a gun on May 4 was not the subject of any

subsequent criminal charges.

Lawson fails to show candor to the Court by claiming Creely and Franke

"reported their discovery of the gun to law enforcement." Creely and Franke did not

report their observation to law enforcement or to any supervisor.[2] Instead, Creely later

shared her observation with Ashley Reid, an FCS-employed social worker who had

come to the guidance suite for an arranged meeting. Creely Deposition, R. 38, Page

ID#: 735-736. They initially discussed concerns over Lawson's behavior or demeanor

and the medications, then Creely informed her about the gun "as an afterthought."

Creely Deposition, R. 38, Page ID#: 736-737. Reid was not a supervisor of Creely,

Franke, or Lawson. Reid Deposition, R. 42, Page ID#: 1191-1192, 1217.[3]

---

[2]    Creely's and Franke's preparation of witness statements as part of
Kopp's subsequent investigation was not a "report" within the contemplation of this
duty, but instead part of their duty under Board Policies 03.133 (R. 36-15, Page ID#:
577) and 03.233 (R. 36-14, Page ID#: 576), respectively, to "cooperate fully with all
investigations conducted by the District." These statements ultimately formed part of
the evidence against them of their <u>failure</u> to timely report the presence of a weapon
to law enforcement.

[3]    Lawson suggests a duty to report certain acts to law enforcement makes
an individual an agent of law enforcement. Lawson Brief, p. 20. She cites no
authority for the proposition that all mandatory reporters become agents of law

While Creely and Reid were meeting on the afternoon of May 4, Lawson returned to the guidance suite, retrieved her purse, and left the guidance suite. Creely Deposition, R. 38, Page ID#: 735; Reid Deposition, R. 42, Page ID#: 1208; Franke Deposition, R. 39, Page ID#: 878.

Reid then texted Marvin Kelly, a deputy with the Franklin County Sheriff's Office who is a school resource officer (SRO) stationed at FCHS, to ask if a concealed carry license allowed a teacher to possess a gun in a school. Reid Deposition, R. 42, Page ID#: 1206. Deputy Kelly told her he did not believe it was legal and later texted her to ask which employee was believed to have a gun in the school. Reid Deposition, R. 42, Page ID#: 1206, 1213. Reid provided Deputy Kelly with Lawson's name. Reid Deposition, R. 42, Page ID#: 1213.

Reid also informed, Kyle Sexton, her direct supervisor at the FCS central office. Reid Deposition, R. 42, Page ID#: 1213, 1215. Around the same time, Deputy Kelly was informing the FCHS Principal, Charles Lewis. BOE Deposition, R. 36, Page ID#: 369. Lewis in turn reported it to Defendant Kopp. BOE Deposition, R. 36, Page ID#: 371, 445. Kopp also received the information directly from Kyle Sexton. BOE Deposition, R. 36, Page ID#: 443. Kopp also informed Jeff Abrams, the FCS School Safety Coordinator who was employed directly by the FCS, but also a sworn

enforcement by virtue of their statutory duty to report.

8

deputy of the Franklin County Sheriff's Office. BOE Deposition, R. 36, Page ID#: 457-458.

Kopp, Abrams, and Kelly discussed a plan for Kopp to be at FCHS the morning of May 5 to meet with Lawson immediately upon her arrival to school. BOE Deposition, R. 36, Page ID#: 457-458. Lawson described that meeting in her Complaint, saying Kopp met her at FCHS on the morning of May 5. Complaint ¶22, R. 1, Page ID#: 5. Kopp escorted her to Deputy Kelly's office and "blocked the exit and made clear the Plaintiff was not permitted to leave." Complaint ¶22 (*id.*). Lawson repeatedly claims the presence of Kelly and Abrams was intended as a "show of force" (Lawson Brief, pages 2, 12, 28, 30) and to "intimidate" (Lawson Brief, pages 12, 28, 30). Both of these statements are attributed to Deputy Kelly, and Lawson even includes the word "intimidate" in quotes on page 12 of her Brief, with citation to pages 18-20 of Kelly's deposition (R. 43, Page ID#: 1239-1241). Neither of these words or phrases appear in Kelly's testimony. Kelly testified only that Superintendent Kopp wanted police presence "[j]ust in case, I mean, something happened. Protection, I imagine. * * * It's a gun involved, I mean." Kelly Deposition, R. 43, Page ID#: 1239-1240. Lawson's repeated mis-characterization of Deputy Kelly's testimony shows a blatant lack of candor to this Court.

9

Though Lawson claims the "detention" lasted more than 20 minutes, the objective video evidence reflects a far shorter meeting. *See* R. 30-8; 30-9; and 31 (notices of conventionally filed video exhibits) (Page ID#: 163, 164, and 343).[4] The body worn camera footage from Deputy Kelly begins in the middle of a statement by Superintendent Kopp, with Abrams seated in the corner away from the door and with Lawson between Deputy Kelly and the doorway. Exhibit 40, R. 37, Page ID#: 681. Kopp says, "so, I need to ask you if this is true." In response, Lawson says, "I'm trying to think. I had one with me this weekend . . .," and bends over her purse to start looking through it without prompting or direction by anyone in the room. Superintendent Kopp takes a step back from Lawson as she leans toward her purse. No more than seventeen seconds into the nearly 3.5 minute video, she affirms the gun is present in her purse. Lawson calls this an "interrogation" and claims Kopp "prompted" her to look into her purse. The video tells a different story. Neither Abrams nor Kelly speaks before she began looking into her purse. Abrams does not

---

[4]        The video marked as Exhibit 41 (R. 37, Page ID#: 681) shows Kopp and Lawson entering the office suite where Deputy Kelly's office is located. They disappear from view at the top center of the screen at on-screen counter time 07:47:51 and enter into Deputy Kelly's office just off screen seconds later. The video marked as Exhibit 42 (R. 37, Page ID#: 681)shows Lawson and Abrams reappear on the same camera at approximately 7:51:26 – a gap of just over 3.5 minutes. Deputy Kelly's body worn camera footage (the video marked as Exhibit 40) (R. 37, Page ID#: 681), though not synced with the school cameras, shows most of the interaction, as it is 3 minutes and 27 seconds in duration until Lawson and Abrams exit.

rise from his chair until after she begins looking in her own purse. Deputy Kelly does not rise from his desk until more than a minute after Lawson affirms the presence of the gun. There is no further questioning by Kopp or either officer beyond the initial statement by Kopp as the video begins. Kopp testified the statement he was making as they entered Deputy Kelly's office was, "I've received a report yesterday that you may have potentially been in possession of a weapon, so I need to ask you, is that true?" BOE Deposition, R. 36, Page ID#: 468. In response to a question about her conduct on May 4, she looked in her own purse and admitted to being currently in possession of a weapon on May 5. Lawson agreed this was the only statement Kopp made before she started looking in her own purse. Lawson Deposition, R. 40, Page ID#: 1103-1104. She claims to have then asked Superintendent Kopp if she needed to look and claims Kopp answered affirmatively. Lawson Deposition, R. 40, Page ID#: 1104. The video unambiguously demonstrates this alleged exchange did <u>not</u> occur. It is not a nearly four-minute interrogation. It is a singular statement by Kopp informing her of the allegation against her and either asking her "is that true" or stating "I need to ask you, is that true." This exchange lasted less than 20 seconds.

Lawson was then suspended with pay pending further personnel action. R. 36-39, Page ID#: 612. She was arrested and cited for felony possession of a gun on school property. R. 30-3, Page ID#: 151. During the course of her suspension with

pay, there were multiple meetings between Kopp and Lawson with attorneys present on behalf of each of them. Lawson Deposition, R. 40, Page ID#: 1111-1112. Commonwealth's Attorney Larry Cleveland had represented his willingness to drop the criminal charges in exchange for Lawson's resignation. Lawson Deposition, R. 40, Page ID#: 1111; BOE Deposition, R. 36, Page ID#: 482-483. Lawson acknowledges she would have had a right to a hearing by an independent hearing body under Kentucky Revised Statute (KRS) 161.790 had she declined to resign. Lawson Deposition, R. 40, Page ID#: 1124. Notwithstanding this hearing right, rather than awaiting Superintendent Kopp's final disciplinary decision, Lawson resigned on June 28, 2023, with advice of counsel. Lawson Deposition, R. 40, Page ID#: 1140; and R. 40-11, Page ID#: 1153. True to his word, Cleveland obtained a No True Bill from the Franklin County Grand Jury the following day. R. 36-50, Page ID#: 627. Lawson presents no facts to suggest there was a "constructive discharge" or that she was forced, coerced, or compelled to resign rather than go through a potential disciplinary hearing. Indeed, Superintendent Kopp extended her suspension with pay to give her time to discuss her options with her attorney and to ensure she was paid in full for the 2020-2021 school year. Lawson Deposition, R. 40, Page ID#: 1071.

12

II.    <u>Procedural History</u>

This matter was initiated on behalf of Lawson by Complaint (R. 1) filed herein on May 1, 2022.  These Defendants timely answered (R. 8, R. 9). The Complaint names four (4) Defendants: Kayla Creely, Lori Franke, Mark Kopp, and the Franklin County Board of Education.[5] R. 1, ¶¶ 3-6, Page ID#: 2-3. The Complaint contains a single Count expressly alleging multiple violations of the Lawson's rights as protected by the Fourth Amendment to the United States Constitution. R. 1, ¶¶ 29-40; Page ID#: 6-9. The details of those alleged violations will be developed more fully below. The Complaint seeks relief in the form of declaratory judgment, an award of compensatory and punitive damages, trial by jury, costs, attorney fees, and other unspecified relief.  R. 1, Page ID#: 9, ¶¶ A-E. Notably, Lawson did <u>not</u> seek equitable or prospective injunctive relief in the form of reinstatement or otherwise.

While the Complaint originally named Defendants Creely and Franke in both their individual and official capacities, those official capacity claims were dismissed by agreed order. R. 16, Page ID#: 105. There were no amendments to the pleadings.

---

[5]     By statute, the correct legal name of this entity is the "Board of Education of Franklin County, Kentucky."  KRS 160.160(1).

## SUMMARY OF THE ARGUMENT

Lawson did not plead or prove a violation of her Fifth Amendment rights, nor does she request this Court to review the Trial Court's threshold determination that she raised no Fifth Amendment claim in her Complaint. Her reliance on Fifth Amendment case law and analysis should therefore be ignored by this Court. Moreover, the facts do not raise a Fifth Amendment violation because no allegedly self-incriminating statement was used against her in any criminal trial.

This Court's appellate consideration of equitable relief is limited to a review for abuse of discretion. Because the Trial Court did not reach the issue of Lawson's demand for equitable relief, there is no determination for this Court to review. Moreover, the facts do not support Lawson's claim for reinstatement or front pay since there was no period of unemployment following her resignation.

Lawson cannot demonstrate state action by Defendants Creely and Franke for purposes of establishing *Monell* liability against the Board, nor can she establish *Monell* liability even if state action is found to exist. Lawson overstates the Board's alleged grant of "unfettered discretion" to rank and file employees by quote mining from two policies in a policy and procedure manual of nearly 1,000 pages. When compared with other related policies, it is demonstrated employees such as Creely and Franke should only have observed and reported rather than initiating their own

14

investigations. Because of these other limiting policies which Lawson ignores, it is also clear that the Board's training of Creely and Franke was not inadequate to the tasks they were required to perform under their job descriptions, the Board was not deliberately indifferent to any risk that employees would violate their co-workers' constitutional rights, and Creely and Franke were not acting under the authority of any Board policy during the incident at issue.

Defendant Kopp did not violate Lawson's rights when he briefly confronted her with the accusation of misconduct, even by inviting her into a private office with law enforcement present. Moreover, there was no use of force, no brandishing of weapons, no raised voices, no prolonged interrogation, or any of the other potential indicia which would raise a brief investigative detention into custody. Additionally, no one searched Lawson's purse, nor did anyone request Lawson to empty or otherwise reveal the contents of her purse – she did so voluntarily and unprompted.

Finally, even if Kopp is determined by this Court to have violated Lawson's rights, he is entitled to qualified immunity. No case relied upon by Lawson to show the right to have been clearly established relates to a supervisor questioning an employee in the workplace. Kopp was not on notice that he was under any affirmative duty to refrain from the course of conduct he pursued in relation to Lawson.

15

## STANDARD OF REVIEW

This Court recently captured the standard of review for this nature of appeal

in *Gammons v. Adroit Med. Sys.*, 91 F.4th 820, 825 (6th Cir. 2024), stating:

> Summary judgment is appropriate where the evidence presents no
> genuine dispute of material fact such that the moving party is entitled to
> a judgment as a matter of law. Fed. R. Civ. P. 56(a).  Federal courts must
> draw all reasonable inferences in favor of the non-moving party in
> evaluating a motion for summary judgment. *Singfield v. Akron Metro.
> Hous. Auth.*, 389 F.3d 555, 560 (6th Cir. 2004). We review de novo the
> district court's grant of summary judgment. *Levine v. DeJoy*, 64 F.4th
> 789, 796 (6th Cir. 2023). And we may affirm on any grounds supported
> by the record, even if they are different from the grounds the district
> court relied upon in reaching its summary judgment decision below. *City
> Mgmt. Corp. v. U.S. Chem. Co.*, 43 F.3d 244, 251 (6th Cir. 1994).

## ARGUMENT

### I.    Lawson Did Not Plead or Prove a Violation of her Fifth Amendment Rights.

Lawson's Complaint presented a single Count, asserting multiple claimed

violations of her rights as secured by the 4th Amendment to the United States

Constitution. Complaint ¶¶29-40 (R. 1, Page ID#: 6-9). She identifies three discrete

acts:  The first is the entry into her purse by Defendants Creely and Franke on May 4,

2021. Complaint ¶32 (R. 1, Page ID#: 7). The second, asserted in the same paragraph,

is a "forced and unconsented-to warrantless search" of her purse "at the direction of

Kopp on May 5, 2021." Complaint ¶32 (R. 1, Page ID#: 7). The third is the "illegal

detention of the Plaintiff in the office on May 5, 2021 by Defendant Kopp." Complaint ¶35 (R. 1, Page ID#: 7). These two paragraphs of the Complaint expressly invoke the Fourth Amendment and never mention the Fifth Amendment.

In spite of the above, Lawson continues to utilize significant Fifth Amendment precedent in her Brief to this Court. However, she does not make any threshold argument to this Court that the Trial Court committed reversible error in determining she had not pleaded a Fifth Amendment claim. R. 95, *fn.* 3, Page ID#: 2033. "An appellant who does not address the rulings and reasoning of the district court forfeits any arguments he might have that those rulings were wrong." (Citations omitted). *Hackett v. City of S. Bend*, 956 F.3d 504, 510 (7th Cir. 2020).

Instead, Lawson seeks to sneak her Fifth Amendment analysis into her appeal by arguing the Trial Court should not have analyzed her Fourth Amendment claim under the *Terry*[6] framework which was not briefed by the parties. Lawson Brief, p. 27. However, in support of this argument, Lawson cites Fed. R. Civ. P. 52 which is facially inapplicable to summary judgment motion. *See* Fed. R. Civ. P. 52(a)(3). Moreover, Lawson failed to bring this objection to the Trial Court's attention by a post-judgment motion filed under any rule. Lawson also cites *United States v. Forness*, 125 F.3d 928, 942 (2nd Cir. 1942), for the proposition that a trial court

---

[6]    *Terry v. Ohio*, 392 U.S. 1 (1968).

should only make "brief and pertinent findings of contested matters." This holding said nothing of a Trial Court being required to stick to the legal theories and arguments articulated by the parties in support of summary judgment. Instead, the *Forness* decision was likewise tied to Rule 52(a) and was expressly tied to the appellate court's inability to examine the trial judge's mental impressions and findings concerning contested matters after a bench trial. If Lawson has a case which says a Trial Court cannot analyze a Fourth Amendment claim under *Terry* solely because the parties did not present a *Terry* framework in their briefs, she decided not to share that authority in her Brief to this Court. Regardless, the Trial Court's failure to analyze Lawson's Fourth Amendment case in the way Lawson sees fit is not error and cannot be deemed to convert a Fourth Amendment case into a Fifth Amendment case.

Even if the Court is persuaded to analyze Lawson's case under a Fifth Amendment analysis, based on controlling precedent, Lawson cannot demonstrate any Fifth Amendment violation. In *Chavez v. Martinez*, 538 U.S. 760 (2003), the Supreme Court held a mere custodial interrogation without *Miranda*[7] warnings is not itself a basis for a Title 42 U.S.C. §1983 claim. The "procedural safeguards" required by *Miranda* are "not themselves rights protected by the Constitution . . .." *See*

---

[7]     *Miranda v. Arizona*, 384 U.S. 436 (1966).

*Michigan v. Tucker*, 417 U.S. 433 (1974). In *Renda v. King*, 347 F.3d 550 (3d Cir. 2003), the Third Circuit even held the use of coerced statements in obtaining an indictment would not violate the Fifth Amendment, because it is the use of coerced statements during a criminal trial which is prohibited by the Constitution. *See also McKinley v. City of Mansfield*, 404 F.3d 418, 438 (6th Cir. 2005) (where coerced statements have not been used at trial, "the plaintiff may not sue because he has not suffered the injury against which the Fifth Amendment protects.").

Violations of the prophylactic *Miranda* procedures do not amount to violations of the Constitution itself, yet claimed violations of these prophylactic procedures are the sum and substance of Lawson's Fifth Amendment argument. Unlike the facts in *Garrity v. New Jersey*, 385 U.S. 493 (1967), Lawson was never directed to respond to questions under threat of losing her employment if she failed to do so – there was no ultimatum to either speak or be fired. Neither *Garrity* nor *Miranda* apply to the facts of this case, even as articulated by Lawson. Lawson's assertion of a Fifth Amendment violation and reliance on Fifth Amendment precedent is utterly unfounded and unwarranted and should be disregarded by this Court. Beyond cavil, Lawson's Fourth Amendment search and seizure claims cannot be decided based on Fifth Amendment custodial interrogation case authority.

19

## II.    This Court Cannot Grant Lawson's Request for Equitable Relief.

The Trial Court never reached the question of Lawson's request for equitable relief, nor the propriety of reinstatement versus front pay, nor Lawson's request for expungement of discipline from her personnel record. As held by this Court in *Gunter v. Bemis Co.*, 906 F.3d 484, 490 (6th Cir. 2018), "[t]he law treats reinstatement and front pay as alternative remedies." While reinstatement is "favored" and "should be granted in the ordinary case" (*Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392, 398 (6th Cir. 1993)), appropriate relief is for the district court to determine in the first instance. This Court may then review that determination for abuse of discretion. *Arban v. West Publ'g Corp.*, 345 F.3d 390, 406 (6th Cir. 2003). At this point, there is no determination for this Court to review on appeal.

Substantively, there is authority for the rule that an award of front pay should be limited to the date of re-employment by another employer. *Macglashan v. ABS LINCS KY, Inc.*, 448 S.W.3d 792, 794 (Ky. 2014). Under the facts of this case, Lawson did not suffer any period of un-employment following her resignation from employment with the Board of Education. Lawson Deposition, R. 40, Page ID#: 1071 (Lawson was paid her full salary for the 2020-2021 school year in Franklin County); Page ID#: 1065 (Lawson immediately obtained employment in Grant County and began her duties there on the first day of school for the 2021-2022 school year). In

20

the event this Court reverses the Trial Court's grant of summary judgment to Defendant Kopp and the Board of Education, a remand for further proceedings, including consideration by the Trial Court in the first instance of Lawson's request for equitable relief, is mandated by *Gunter*, *supra*.

### III. Lawson Cannot Demonstrate State Action by Creely and Franke, for purposes of Establishing *Monell* Liability Against the Board; Nor Can She Demonstrate *Monell* Liability Even if State Action is Found to Exist.

To the extent liability against the Board of Education is premised on the conduct of Defendants Creely and Franke on May 4, 2021, the Board of Education adopts by reference Argument II of the Brief of Appellees Franke and Creely, as permitted by Federal Rule of Appellate Procedure (FRAP) 28(i).[8]

It is acknowledged public employees enjoy some expectation of privacy in the personal effects (handbags and briefcases) they bring with them to work. *See O'Conner v. Ortega*, 480 U.S. 709, 716 (1987). This expectation, however, only extends to protect the employee from <u>state</u> action which invades their privacy. It does not extend to private action. Pursuant to *West v. Atkins*, 472 U.S. 42 (1988), the "under color of state law" requirement for Section 1983 liability is whether the conduct is "fairly attributable to the State." 472 U.S. at 49. The Court explained

---

[8]    Lawson makes no argument on appeal that Kopp is liable under §1983 under a theory of *respondeat superior* for the actions of Creely and Franke.

public employees are generally deemed to be acting under color of law if acting in their official capacity or while exercising their responsibilities pursuant to state law. *Id.* at 50. In this matter, however, there is no factual basis for concluding Defendants Creely and Franke were acting "in their official capacity" or "exercising their responsibilities" as employees of the Board when they ventured into Lawson's office and examined the contents of her purse. Undeniably, neither of them had investigatory duties as part of their jobs, neither of them was a supervisor of Lawson, neither of them was assigned the task of making any inquiry into Lawson's conduct or behavior, and their immediate supervisors were unaware of and did not direct their conduct regarding Lawson's office and purse on May 4, 2021.

Moreover, there's no evidence of any similar course of conduct by Creely or Franke in relation to any other co-worker or student at any time during their employment such that they could have even formed a reasonable belief such conduct fell within the scope of their assigned tasks. There does not appear to be any authority for the legal conclusion that the "color of state law" test is satisfied by the mere showing that a public employee was at her job site or "on the clock" at the time of the challenged conduct. To the contrary, in *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975), the Court made it clear that "[i]t is the nature of the act performed, not . . . the status of being on duty, or off duty, which determines whether the officer has

22

acted under color of law." The evidence in this matter is that, despite being in the office suite shared by themselves and Lawson, and despite events transpiring within their respective work days, Creely and Franke departed from their job duties and responsibilities and unilaterally undertook to snoop in Lawson's personal possessions.

Further to this point, it is submitted not every unkindness or slight, or even tort, committed by one government employee toward another government employee should rise to the level of a constitutional violation, especially if committed against a fellow employee over whom the actor has zero actual authority – or even apparent authority – by virtue of their respective government employment positions. That Creely's and Franke's employment gave them the circumstantial *ability* to invade Lawson's privacy does not equate to a conclusion their employment in any way authorized their actions or that they acted out of any belief that their actions were authorized by their employment. When contrasted to the cases cited by Lawson, unlike teachers who abuse their positions of authority to coerce, pressure, and victimize students,[9] or police officers and judges who abuse their positions of

---

[9]    *See Wilson v. Webb*, 2000 U.S. App. LEXIS 23585 (6th Cir. 2000); and *Doe v. Claiborne County*, 103, F.3d 495 (6th Cir. 1996).

23

authority to coerce, pressure, and victimize citizens,[10] there is no hint in this matter that Creely and Franke lorded any apparent authority over Lawson in order to coerce, pressure, or victimize her. Those cases concerning state action relied upon by Lawson are simply inapposite to the legal question before the Court. The circumstances of Creely's and Franke's status as suite-mates with Lawson may have been sufficient to facilitate their snooping into Lawson's purse, but their status as government employees was not a necessary element to their invasion of Lawson's privacy. Thus their conduct should not be deemed "state action." There mutual government employment was incidental and inconsequential to the interaction between co-workers, and is starkly distinguishable from government employees who victimize fellow citizens over whom their state employment grants them actual or apparent government authority, where their government employment is a *sine qua non* for committing the injurious act.

Under *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978), in order to demonstrate liability against the Board of Education for the conduct of Creely and Franke, Lawson must demonstrate the Board was the moving force behind the claimed violation of her rights. Lawson argues two theories in support of *Monell*

---

[10]     *See United States v. Lanier*, 73 F.3d 1380 (6th Cir. 1996), vacated on other grounds by 520 U.S. 259 (1997)..

24

liability - first, that the conduct of Creely and Franke was due to inadequate training by the Board; or second, that the search was conducted pursuant to or authorized by Board policy. Taking these in reverse order, Lawson argues the Board of Education, by policy, affirmatively granted every employee, including Creely and Franke, unfettered discretion to do as they pleased in the name of health and safety. Lawson can only pursue this argument by quote mining a single phrase repeated in two policies in a policy and procedure manual extending just over a thousand pages.[11] *See* Board Policy 03.133 - Duties for Certified Personnel (R. 36-15, Page ID#: 577); Board Policy 03.233 - Duties for Classified Personnel (R. 36-14, Page ID#: 576).[12] The introductory sentence of each of these policies requires employees to "use sound judgment in the performance of their duties and take reasonable measures to protect the health, safety, and well-being of others . . .." *Id.* Facially, this is a precatory expression introducing the next two sections of the cited policies, and does not independently create duties or grant any discretion to employees to determine their own duties. It instructs them as to the mindset for performing the duties as outlined

---

[11]     *See* https://policy.ksba.org/Chapter.aspx?distid=32 (accessed 10-3-24).

[12]     Certified employees are essentially those with certificates issued by Kentucky's teacher licensing agency, the Education Professional Standards Board. *See* KRS 161.020, 161.028. Classified employees are those who do not require certification, even if they may require other professional certification or licensure.

25

in their particular job descriptions. The "investigations" section of those very policies instructs all employees to cooperate with investigations which are authorized by other policies or laws. Nowhere in this policy does it suggest rank and file employees can or should undertake their own investigations.

Notably, there is a separate health and safety policy (R. 36-10, Page ID: 566-568) which requires unsafe conditions to be reported to a supervisor who is then to "examine" (investigate) and "take appropriate action." Read together, this demonstrates investigation of any perceived unsafe work condition is a duty of the supervisor, not the duty of the employee who discovers it. This obviates Lawson's argument that the "reasonable measures" language somehow grants employees unfettered discretion to do anything they saw fit. Lawson also relies on the Board's weapons policy (R. 36-12, Page ID#: 571-573), which allows principals to authorize searches based on "reasonable suspicion . . . in compliance with applicable Board policies." When these related policies are read *in pari materia*, it is evident the Board has expressly granted a principal the duty to "examine" unsafe conditions and to authorize certain searches, and, under the doctrine of *expressio unius est exclusio alterius*, has denied these duties and authorities to rank and file employees like Creely and Franke.

26

Alternatively under this theory of *Monell* liability, an agency can be held liability for an employee's application of an otherwise constitutional policy if it leads to an unconstitutional result. *See Monistere v. City of Memphis*, 115 Fed. Appx. 845, 850 (6th Cir. 2004). There is no evidentiary record to support any claim Creely or Franke was even aware of the "sound judgment" and "reasonable measures" policy language to which Lawson points, and certainly no evidence they were applying or attempting to apply that policy when they snooped in Lawson's purse. Neither of them acted on the belief they had been directed or authorized by Board policy to undertake the specific conduct at issue herein. There is simply no basis under this theory for finding the Board liable for the alleged search by Creely and Franke.

The other potential theory of liability for the Board under *Monell* is the Board's alleged "failure to train Defendants Creely and Franke." This nature of liability arises when an agency fails to "provide adequate training in light of foreseeable consequences that could result from the lack of instruction." *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999). As phrased by this Court in *Berry v. Delaware County Sheriff's Office*, 796 Fed. Appx. 857, 861 (6th Cir. 2019), one of the elements required to prove such a claim is the existence of "a training program . . . inadequate to the tasks that the officers must perform." (Emphasis added.) Based on the collective language of the policies discussed above, and the absence of any evidence

27

of similar incidents before or since,  it is submitted it was not foreseeable that any

rank and file employee would undertake to investigate a co-worker's conduct or

search a co-worker's personal belongings, based solely on the precatory expression

in their respective "Duties" policies. Certainly these investigations and searches were

not "tasks" that these employees "must perform" under the *Berry* elements. Further,

as this Court recently held in *Mosier v. Evans*, 90 F.4th 541, 549-50 (6th Cir. 2024):

> A showing of deliberate indifference requires that the municipality "completely disregarded" its duty to train. *Harris v. City of Saginaw*, 62 F.4th 1028, 1038 (6th Cir. 2023). Typically, that means total inaction in the face of repeated, known, rights violations. *See Shadrick v. Hopkins County*, 805 F.3d 724, 738-39 (6th Cir. 2015). In a "narrow range of circumstances," when a rights violation is a "highly predictable consequence" of inadequate training, repeated rights violations need not be shown. *Id.* at 739 (*quoting Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*,  520 U.S. 397, 409, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)). But in those cases, the risk of rights violations must be "so obvious," and the inadequate training "so likely" to result in such violations, that the municipality can fairly be described as deliberately indifferent. *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989).

Lawson argues *ipse dixit* that the inclusion of a precatory statement encouraging

"sound judgment" and "reasonable measures" in the performance of duties created

an obvious and highly predictable consequence that employees might search their co-

workers' personal belongings.  She offers no explanation for why this should be

included in that "narrow range of circumstances" where a single violation could

28

demonstrate deliberate indifference, and she unequivocally fails to show repeated, known violations of other employees' 4th Amendment rights at the hands of their non-supervisory co-workers.

There is no evidence Creely or Franke lacked adequate training for the tasks they "must perform" under their respective job titles and job descriptions. Snooping in a co-worker's personal possessions is not obviously a constitutional violation; and, even if it is, it is not a clearly foreseeable task any rank and file employee would be required to perform in relation to their own job duties. There is simply no basis whatsoever, in fact or law, to conclude the Board's training program was deliberately indifferent and thereby caused any violation of Lawson's constitutional rights.

## IV. Lawson's Constitutional Rights were Not Violated by Defendant Kopp.

Upon learning of the unlawful presence of a gun in a school building in the possession of an employee, Kopp was under a legal duty to address the conduct. Indeed, a superintendent is uniquely authorized to take all personnel action in a school district. *See* KRS 160.370 and 160.390. Because Lawson had left for the day on May 4 when Kopp learned of the conduct, he determined to meet with her upon her arrival to school the following morning. In order to determine whether Kopp's meeting with Lawson should be characterized as a custodial seizure within the

meaning of the Fourth Amendment, the Court must look to whether in view of all circumstances surrounding the incident, a reasonable person would have believed that they were not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980).[13] Even in the pure law enforcement context, there are no 4th Amendment implications when a law enforcement officer approaches a person to engage them in conversation or asks them to answer a few questions. *Florida v. Bostick*, 501 U.S. 429, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991).[14] This remains true even if the person is asked to accompany an officer to another area or room, *United States v. Collis*, 766 F.2d 219, 221 (6th Cir. 1985),[15] and is especially true when the location of the interview is not inherently intimidating. *United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998).

---

[13]    The Supreme Court in *Mendenhall* relied on *Terry* in its analysis, and found a brief investigative stop was not converted into an arrest or detention even when the citizen was asked to and did voluntarily accompany the agents to the DEA office. *Mendenhall* was relied upon in Kopp's brief to the Trial Court (R. 51, Page ID#: 1498), thereby demonstrating a *Terry* analysis was implicitly invited by these Defendants in their briefing below.

[14]    *Bostick* also relied on *Terry* in its analysis, and was relied upon by Kopp in his brief to the Trial Court (R. 51, Page ID#: 1499).

[15]    *Collis* also relied on *Terry* in its analysis, and was relied upon by Kopp in his brief to the Trial Court (R. 51, Page ID#: 1499).

In this matter, at the time Lawson was initially invited to speak with Defendant Kopp in private, law enforcement officers were not even visible, and the location of the interview was an office nearly identical to Lawson's own, in the same building where she worked, with none of the hallmarks of an interrogation room. In *California v. Beheler*, 463 U.S. 1121, 1125-26, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983), the Court held a detainee was not even in custody when questioning took place in a police station. More apropos to this matter, in *United States v. Mahan*, 190 F.3d 416, 421-422 (6th Cir. 1999), the Court held a detainee was not in custody where the questioning by an FBI Special Agent and local Sheriff took place at the detainee's place of work, and the detainee was summoned to the interview by a supervisor. Additionally, the Court in *Mahan* found it significant the officers "at no time made any show of force or brandished a firearm or handcuffs." *Id.* In this matter, despite the presence of two deputy sheriffs, Lawson was questioned in her place of work, was invited to the interview by a supervisor, and was questioned by that supervisor rather than by law enforcement officers.

Since the presence of officers alone, or being in a closed room with officers, or even being questioned by officers is not deemed to create an "inherently intimidating" environment in the above-cited cases, the fact Defendant Kopp brought Lawson into an office with deputies present (in khaki pants and polo shirts) could not

31

be deemed to have created an inherently intimidating environment.  As reflected on the video discussed above, Lawson was never told she was restricted from leaving, she was not handcuffed, the door to the office was not locked, the interview itself was incredibly brief – she was asked a single question as she entered the room and no further questions followed. She even acknowledged in her deposition she was asked one question about her conduct the prior day, and the video reflects her immediate and voluntary move toward her purse while the deputies remained seated (not between her and the door) and while Defendant Kopp took a step back rather than toward her as she began looking into her purse. There was no show of physical force or raised voices while the single question was being asked, and no verbal threats or disparaging remarks were made which might have created an intimidating environment. While Kopp was between her and the door, the video evidence is that this was the order in which they entered the room, with her walking ahead of him, and him closing the door behind himself after they entered. This is not evidence of Lawson being blocked or trapped in the room by a show of force or through threatening or intimidating tactics. A consensual interview cannot constitute a seizure "absent coercive or intimidating behavior which negates the reasonable belief the compliance is not compelled." *Collis*, 766 F.2d at 221. While the entirety of her time in Deputy Kelly's office was close to 3.5 minutes, the relevant portion of the meeting

was the first 20 seconds. By the conclusion of those first 20 seconds as shown on Deputy Kelly's body worn camera recording, the single question had been asked by Kopp and Lawson had quickly examined the contents of her purse and admitted to the presence of the gun.[16]

While Lawson may seek to dwell on the fact Deputy Kelly's body worn camera was not activated as she was entering the room, the comparison between the building surveillance cameras showing her entering and leaving the office area and the body worn camera showing her in Deupty Kelly's office reflect an unrecorded gap of as little as 3-5 seconds and maybe as long as 7-10 seconds. This gap is insufficient for her to have been threatened, intimidated, harassed, coerced, or disparaged before Kopp and she assumed the calm, measured tones reflected as the body worn camera footage begins. Less than twenty seconds later, the interview was over. *See also United States v. Gaddie*, 2008 U.S. Dist. LEXIS 37135 (W.D. Ky. May 6, 2008) (collecting cases for the proposition that a person would feel free to leave absent hostility, lengthy questioning, or shows of force, and concluding questioning of "little

---

[16]    Lawson was not being questioned about her conduct on May 5, but her admission related to her conduct on May 5. Since this was not responsive to the sole question she was asked, it cannot be the product of any improper interrogation. *See United States v. Murphy*, 107 F.3d 1199, 1204 (6th Cir. 1997) (information provided voluntarily rather than in response to questioning did not require suppression).

33

more than an hour" in the Office of Inspector General's interview room at the individuals' place of employment did not mean he was "in custody").

The cases relied upon by Lawson are inapposite. In *Dunaway v. New York*, 442 U.S. 200 (1979), the individual was taken into custody and was driven to police headquarters in a police car and placed in an interrogation room, though this initial de facto arrest was unsupported by probable cause. No similar facts exist in Lawson's case. In *Florida v. Royer*, 460 U.S. 491 (1983), it was law enforcement officers who stopped the defendant and asked him to accompany them to a small room while seizing his luggage. In Lawson's case, it was her employer who met her as she was arriving to work and asked her to accompany him to an office in the administrative suite, just like her own office.

In *United States v. Lopez-Arias*, 344 F.3d 623 (6th Cir. 2003), the case relied upon by Lawson to support her argument that "transportation to another location, significant restraints on freedom of movement . . ., and the use of weapons or bodily force" will escalate a detention into a custodial seizure, the facts involved  "[f]our DEA agents in four unmarked DEA vehicles activat[ing] their sirens and emergency lights and stopp[ing] the [suspect] . . . with weapons drawn, . . . then handcuff[ing] defendants and plac[ing] them into separate DEA vehicles" and driving them away from the scene. 344 F.3d at 626. Lawson doesn't suggest to this court how <u>any</u> of the

34

facts in the matter *sub judice* are supposed to line up with those in *Lopez-Arias* to show Lawson was likewise subjected to a custodial arrest during the few seconds she walked alongside Superintendent Kopp to a private office to be asked a sensitive question concerning allegations of misconduct. Lawson suggests the least intrusive means for accomplishing this brief investigative purpose would have been to simply confront her with the allegation at the door of the school, but the record shows Lawson's middle school aged son was with her as she entered the school, and it would have been grossly inappropriate for a supervisor to conduct an investigation of employee misconduct in the presence of any student, and especially so in front of the employee's own child. Affording Lawson the privacy and dignity of a private office was less intrusive than confronting her in front of her own child. *See United States v. Salvo*, 133 F.3d 943, 951 (6th Cir. 1998) (questioning in an FBI agent's car was intended for solicitude, "to save him from a more public exposure of his criminal activity").

The cases relied on by Lawson to show she was "in custody" or "detained" are factually far removed from the circumstances before the Court, and almost universally conclude the interviews at issue in those cases were non-custodial despite far greater indicia of "custodial interrogation" than were present in the events involving Lawson on May 5, 2021. These same cases are relied upon by Lawson to

35

demonstrate the right at issue was "clearly established" but not a single case is sufficiently similar to have placed Superintendent Kopp on notice that his conduct might violate a subordinate employee's constitutional rights. With the exception of one entirely impertinent case involving student discipline, the cases cited by Lawson relating to "custody" all discuss investigative interviews conducted by law enforcement officers in relation to subsequent criminal prosecutions, rather than interviews by supervisors regarding workplace conduct which also happened to be criminal in nature. There was no questioning of Lawson by law enforcement officers or at the direction of law enforcement officers, until after she had informed Superintendent Kopp that she was in possession of a weapon on school property.

In *United States v. Panak*, 552 F.3d 462, 466 (6th Cir. 2009), an interview in the home by federal Drug Enforcement Administration investigators was determined to be <u>non</u>-custodial despite lasting between 45 minutes and an hour. The Court suggested a greater show of force (more officers, conspicuous displays of <u>drawn</u> weapons, or the nature of the questioning) could turn it into a custodial interrogation, but reiterated interviews lasting even up to an hour-and-a-half could still be non-custodial, even in the law enforcement context. 552 F.3d at 467, *citing United States v. Mahan*, 190 F.3d 416, 420 (6th Cir. 1999) (an hour and thirty-five minutes of questioning by an FBI agent in the workplace was non-custodial).

36

In *United States v. Luck*, 852 F.3d 615, 621 (6th Cir. 2017), two Federal Bureau of Investigation agents questioned the "21-year-old kid who never lived outside of his parents' home" in his parents' home for "roughly an hour" in a "calm, conversational manner, never becoming aggressive or brandishing weapons" and this was determined to be <u>non</u>-custodial.

In *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010), an interview "of short duration–lasting only a few brief questions" in the suspect's bedroom by two Immigration and Customs Enforcement (ICE) agents along with members of the Lansing (Michigan) Police Department was deemed non-custodial.

In *United States v. Salvo*, *supra*, 133 F.3d at 951, interviews in the suspect's "dormitory computer room" and in an FBI agent's car in "the parking lot of the Burger King restaurant" were found to be non-custodial. Even as to the agent's car, the Court found this was chosen out of "solicitude" for the suspect "to save him from a more public exposure of his criminal activity." *Id.*

In *United States v. Martinez*, 795 Fed. Appx. 367, 373-374 (6th Cir. 2019), the Court found even the suspect's unfamiliarity with the location of the interview did not turn his interview by FBI agents for eighty minutes of calm and noncombative questioning into a custodial interrogation.

37

In *United States v. Zabel*, 35 F.4th 493, 502-503 (6th Cir. 2022), the Court found the suspect's questioning by United States Park Rangers in his place of employment for less than 20 minutes, in a manner which was not hostile, was non-custodial even though the rangers had "limited his movement by ordering (not requesting) him to follow them to a new location away from his coworkers." The *Zabel* Court, like the *Salvo* Court, again highlighted the apparent intent of the law enforcement agents to show consideration for the suspect by separating him from his coworkers before asking questions about a sensitive subject. *Id.* at 503.

In *Howes v. Fields*, 565 U.S. 499, 515 (2012), the Court held a suspect was not in a custodial interrogation in a prison conference room despite not consenting to an interview and not being advised he was free to decline to participate, and despite the fact "[t]he interview lasted for between five and seven hours in the evening and continued well past the hour when respondent generally went to bed" and despite the interviewing deputies being armed and using "a very sharp tone" and "profanity."

Lawson cites *Tarter v. Raybuck*, 742 F.2d 977 (6th Cir. 1984), as though it is a public employment case. It is a student discipline case involving a search of the student's clothing, including the removal of some of his clothing. This search was governed by an entirely separate legal analysis relating to students, and provides no guidance in the matter involving Lawson.

38

Likewise, the case of *Gardner v. Broderick*, 392 U.S. 273 (1968) offers no guidance on Lawson's case. There, an police patrolman was subpoenaed to testify before a grand jury concerning the performance of his duties, was advised of his privilege against self-incrimination, and was then asked to sign a waiver of immunity or be fired if he failed to do so. 392 U.S. at 274. Refusing to sign the waiver, he was fired. *Id.* In contrast, Lawson was never told her failure to answer the single question asked of her by Superintendent Kopp might result in her termination, so she was neither explicitly nor implicitly given the ultimatum which was at issue in *Gardner*, or, for that matter, the choice at issue in *Garrity v. New Jersey*, 385 U.S. 493 (1967).

Even in the pure law enforcement context, there are no 4th Amendment implications when a law enforcement officer approaches a person to engage them in conversation or asks them to answer a few questions, even if asked to accompany the officer to another area or room, and especially if the location is not inherently intimidating. *See Florida v. Bostick*, 501 U.S. 429, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991); *United States v. Collis*, 766 F.2d 219, 221 (6th Cir. 1985), and *United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998). The interviewee's workplace is not an inherently intimidating location, and the presence of law enforcement officers with whom the interviewee works on a regular basis does not alter that fact. The lesson to be learned from the cases cited by Lawson is that the presence of law enforcement

officers (even in greater number than two), being in a closed room with officers, and being questioned <u>by officers</u> for prolonged periods of time, including in a prison conference room or a location completely unfamiliar to the interviewee were not enough to create an "inherently intimidating" environment. By contrast to the cases relied upon by Lawson, Superintendent Kopp brought Lawson into an office similar to her own, in her workplace, with deputies present in khaki pants and polo shirts, without brandishing their weapons or handcuffs, and questioned her for less than 30 seconds about her conduct the previous day before she opened her own purse and acknowledged the ongoing presence of a gun.

Considering the totality of the circumstances, only one factors weighs in favor of Lawson – she was not overtly informed she was not obligated to answer the single question which was asked of her by her supervisor. In contrast, and weighing in against Lawson, the location was an office in her own workplace which bore no resemblance to an interrogation room, neither the length nor manner of questioning was hostile or intimidating[17], and there was no overt restraint on her freedom of movement. The only implied restraint in the small office was due to the

---

[17]    Lawson claims the interview time was "less than four minutes," but as explained above, she was asked a single question: "so, I need to ask you if this is true," and in response, Lawson immediately started looking through her tote without prompting or direction, and confessed to the presence of a weapon within 17 seconds of this question being asked by Superintendent Kopp.

40

Superintendent standing between her and the door because he was the last one to enter, and both she and the Superintendent remained standing throughout their brief interaction. Lawson asserts the "accusatory nature of the interview" weighs in favor of custody. She cites *United States v. Martinez*, *supra*, for this argument, so a further discussion of *Martinez* is warranted. There, the Court wrote:

> "The interview might be described as 'accusatory' in the sense that the agents believed Martinez had committed crimes and laid out the evidence they had against him. But that is not enough to create custody: '*Miranda* warnings are not required simply . . . because the questioned person is one whom the police suspect.' [*United States v. Levenderis*, 806 F.3d 390 (6th Cir. 2015)] at 400 (alteration in original) (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983)); *see also United States v. Saylor*, 705 F. App'x 369, 374-75 (6th Cir. 2017) ('We have never held . . . that a noncustodial conversation may be transformed into a custodial interrogation simply by virtue of the fact that police confronted the defendant with evidence of guilt.'). A statement by an officer that he believes the suspect is guilty is relevant only to the extent that it 'affect[s] how a reasonable person in that position would perceive his or her freedom to leave.' [*Stansbury v. California*, 511 U.S. 318 (1994) (per curiam)] at 325. We have previously found no *Miranda* custody where, as here, a federal agent confronted the defendant with images of child pornography downloaded from his computer and, unlike here, even informed the defendant that the Government was going to prosecute him. *Salvo*, 133 F.3d at 953. In this case, the tone of the conversation remained calm and noncombative, and we would certainly not describe it as so 'relentless' or 'accusatory' that it would lead Martinez to believe he was not free to leave.
>
> "It is true that one of the agents called Martinez's answers 'bullshit' on one occasion—but this did not happen 'repeatedly,' as the district court found, and the agent's tone was not hostile or aggressive [sic]."

41

795 Fed. Appx. at 374-375.  In light of this description of a law enforcement interrogation which was still deemed non-custodial, Lawson's claim that she was interrogated in an "accusatory" manner is disingenuous, at best, considering the calm, casual tone of Superintendent Kopp's single question to her before she admitted to possessing a weapon on school property at the time of their meeting. Similarly disingenuous is Lawson's description of *United States v. Fortney*, 772 Fed.Appx. 269 (6th Cir. 2019) as a "similar bag search" and a "similar factual situation." There, responding to a rumor that an employee carried a gun to work, the employer utilized law enforcement officers to physically encircle the employee while the boss searched the just-fired employee's backpack.

Beyond the complete absence of any evidence Lawson was "in custody" or "seized" for 4th Amendment purposes, there is also no evidence she was asked or compelled to reveal the contents of her purse. After Kopp asked her about having a gun with her the previous day, she claims to have asked him whether she needed to look in her purse, and she further claims Kopp answered affirmatively to that inquiry, thereby making her believe she was being compelled to reveal the contents of her purse. Lawson Deposition, R. 40, Page ID#: 1104. The video unambiguously demonstrates no exchange occurred after Kopp asked the single question which he is concluding as the body worn camera recording begins. There is no evidence Kopp

42

or either of the deputies made any verbal request or demand to look into her purse, no evidence any of them attempted to look into her purse or come between her and her purse after she placed it in a chair, and no evidence Kopp or either of the deputies directed her to empty her purse. Lawson looked into her own purse in order to answer the single question which had been asked of her.  Kopp was not standing over her as she looked into her purse. Instead, he took a step back as she began looking into her own purse. Deputy Abrams stood up and stepped forward after Lawson began looking in her purse, and he had not even arrived next to her and her purse until <u>after</u> she acknowledged the presence of the gun in her purse. There is, therefore, no factual or legal basis for the claim Kopp subjected her purse to a "search" on May 5.

## V.    Superintendent Kopp is Entitled to Qualified Official Immunity.

If the Court determines Superintendent Kopp's conduct did violate Lawson's rights under the 4th Amendment, the Court is respectfully urged to affirm summary judgment in Superintendent Kopp's favor on the alternative ground of  qualified official immunity.[18]  Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a

---

[18]    This argument was presented to the Trial Court in Defendant Kopp's Motion for Summary Judgment, R. 51, Page ID#: 1503-1506.

43

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of qualified immunity is "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz*, 533 U.S. 194, 206 (2001). An official may, however, be held individually liable for civil damages for the unlawful action if the action was not objectively reasonable in light of the legal rules that were "clearly established" at the time it was taken. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Creighton*, 483 U.S. at 640. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see *Mitchell v. Forsyth*, 472 U.S. 511, 535, n. 12 (1985); but it is to say that in the light of pre-existing law "the lawfulness must be apparent." *Creighton*, *supra*, 483 U.S. at 640. When determining whether a right is "clearly established," this Court must look first to decisions of the Supreme Court, then to decisions of the Sixth Circuit Court of Appeals, then to other courts within the Sixth Circuit, and finally to decisions of other circuits. *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991). Once a defendant has asserted the defense of qualified immunity, the burden shifts to the plaintiff to establish that the defendant's conduct violated a right so clearly established that any official in his position would have

44

clearly understood that he or she was under an affirmative duty to refrain from such conduct. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992). The ultimate burden of proof is on the plaintiff to show the defendant is not entitled to qualified immunity. *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

In light of the cases cited above in relation to custodial seizures, it is submitted it was not clearly established that an extremely brief questioning of a subordinate, at her workplace, in an office similar to her own, in the presence of law enforcement but with no threat or display of force, might be deemed a seizure under the 4th Amendment (or a custodial interrogation under the Fifth Amendment).

Also, it is further submitted it was not clearly established that Lawson's apparently voluntary search of her own purse on May 5 in order to respond to Kopp's single statement about her conduct might somehow be deemed a compulsory, vicarious search by Kopp despite the fact he did not direct her to open or empty her purse, did not touch her purse, did not look into her purse before she admitted the presence of the gun, did not come between her and her purse so as to gain constructive control over her purse, and indeed took a step away from her and her purse at the moment she began looking into her purse on her own so she could ascertain the answer to the single question she was asked.

45

The Court's qualified immunity analysis must examine whether a reasonable person in Kopp's position would have understood that the above-cited sequence of events late in the day on May 4 and first thing in the morning on May 5 was violating a subordinate's 4th Amendment rights. As summarized in *Clemente v. Vaslo*, 679 F.3d 482, 490 (6th Cir. 2012), "the case law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." (Citations and internal quotations and subquotations removed). *See also Akers v. McGinnis*, 352 F.3d 1030, 1042 (6th Cir. 2003) (noting that the right must be "so clearly established when the acts were committed that any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct").

It is submitted the unique factors presented in the public school context, the singular nature of the co-workers' conduct by which the presence of the gun was discovered, and the extraordinarily brief questioning (less than 20 seconds from question to admission), are not approximated in any prior case in the "designated

jurisdictional pool"[19] so as to have dictated to Kopp that he was under an affirmative duty to refrain from the course of conduct he pursued on May 5.

The cases relied upon by Lawson do not alter this analysis. Every one of the cases cited by her in relation to the issue of "custody" is a case involving the investigative actions of law enforcement officers. *See Panak*, 552 F.3d 462, 465, 467; *Luck*, 852 F.3d 615, 621; *Hinojosa*, 606 F.3d 875, 883; *Salvo*, 133 F.3d 943, 951; *Martinez*, 795 F. App'x 367, 374; *Zabel*, 35 F.4th 493, 503; and *Fields*, 565 U.S. 499, 515. Since the Fifth Amendment is not implicated by her Complaint, her citation to cases concerning the required administration of either a *Miranda* or *Garrity* warning are utterly inapposite to the qualified immunity analysis.

## CONCLUSION

For the foregoing reasons, the Court is respectfully urged to affirm the District Court's Opinion and Order (R. 95) and Judgment (R. 96) granting these Defendants' Motion for Summary Judgment.

---

[19]    The "designated jurisdictional pool" from which a Court might find a right to have been clearly established was described in *Williams v. Ellington*, 936 F.2d 881 (6th Cir. 1991), as the United States Supreme Court and the other courts within the particular federal circuit. This designated jurisdictional pool <u>excludes</u> unpublished decisions since they are not binding authority and therefore cannot establish a constitutional right. *See El v. City of Pittsburgh*, 975 F.3d 327, 340 (3d Cir. 2020).

Respectfully submitted,

  /s/ Grant R. Chenoweth
Grant R. Chenoweth
Jonathan C. Shaw
PORTER, BANKS, BALDWIN & SHAW, PLLC
327 Main Street ~ P.O. Drawer 1767
Paintsville, Kentucky 41240
Telephone: (606) 789-3747
E-mail: *gchenoweth@psbb-law.com*
COUNSEL FOR MARK KOPP AND THE
  FRANKLIN COUNTY, KY BOARD OF
  EDUCATION

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,002 words, excluding those parts exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect 2020 in 14-point Times New Roman.

  /s/ Grant R. Chenoweth
Grant R. Chenoweth

## CERTIFICATE OF SERVICE

I hereby certify the foregoing **BRIEF FOR APPELLEES, MARK KOPP and THE BOARD OF EDUCATION OF FRANKLIN COUNTY, KENTUCKY** has been filed on this the 3rd day of October, 2024, using the Court's electronic case filing (ECF) system, which will, in turn, cause it to be served on counsel of record.

  /s/ Grant R. Chenoweth
Grant R. Chenoweth

48

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Docket | Description | Page ID# |
|---|---|---|
| 1 | Complaint | 1-11 |
| 8 | Answer for Kopp | 44-57 |
| 9 | Answer for Board of Education | 58-72 |
| 16 | Order Dismissing Creely and Franke in Official Capacity | 105 |
| 30-3 | Criminal Citation | 151 |
| 30-8 | Conventionally Filed Video | 163 |
| 30-9 | Conventionally Filed Video | 164 |
| 31 | Notice of Conventionally Filed Videos | 343-344 |
| 36 | Board of Education Designees' Deposition | 350-546 |
| 36-10 | Health and Safety Policy | 566-568 |
| 36-12 | Weapons Policy | 571-573 |
| 36-14 | Classified Personnel Duties Policy | 576 |
| 36-15 | Certified Personnel Duties Policy | 577 |
| 36-39 | Suspension with Pay Letter | 612 |
| 36-50 | No True Bill | 627 |
| 37 | Notice of Conventionally Filed Videos | 681-682 |
| 38 | Creely Deposition | 683-782 |
| 38-13 | Photo of Lawson's Tote | 819 |
| 38-14 | Photo of Lawson's Tote | 820 |
| 39 | Franke Deposition | 832-907 |
| 40 | Lawson Deposition | 935-1142 |
| 40-11 | Resignation Letter | 1153 |
| 42 | Reid Deposition | 1185-1219 |
| 43 | Kelly Deposition | 1222-1263 |
| 43-3 | Photo of Lawson's Tote | 1266 |
| 43-4 | Photo of Lawson's Tote | 1267 |
| 43-5 | Photo of Lawson's Tote | 1268 |
| 46-1 | Declaration of Wiest with Office Photos | 1441-1453 |
| 51 | Motion for Summary Judgment for Kopp and Board of Education | 1487-1510 |
| 95 | Opinion and Order | 2011-2044 |
| 96 | Judgment | 2045 |